# No. 15-60562

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

MARIA CAZORLA; ET AL.,
Plaintiffs
v.
KOCH FOODS OF MISSISSIPPI, L.L.C.; JESSIE ICKOM,
Defendants

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,
Plaintiff-Appellant Cross-Appellee
v.
KOCH FOODS OF MISSISSIPPI, L.L.C.,
Defendant-Appellee Cross Appellant

**On Appeal from the United States District Court
for the Southern District of Mississippi
Nos. 3:10-cv-00135 & 3:11-cv-00391, Hon. Daniel P. Jordan III Presiding**

**BRIEF FOR THE NATIONAL LABOR RELATIONS BOARD AS *AMICUS CURIAE*
URGING PARTIAL REVERSAL IN SUPPORT OF APPELLANT CROSS-APPELLEE
U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

BARBARA A. O'NEILL
  *Assistant General Counsel*

NANCY E. KESSLER PLATT
  *Deputy Assistant General Counsel*

DIANA ORANTES EMBREE
  *Supervisory Attorney*

MISCHA BAUERMEISTER
  *Attorney*

AARON SAMSEL
  *Law Clerk*

RICHARD F. GRIFFIN, JR.
  *General Counsel*

JENNIFER ABRUZZO
  *Deputy General Counsel*

JOHN H. FERGUSON
  *Associate General Counsel*

**NATIONAL LABOR RELATIONS BOARD**
1015 Half St., S.E.
Washington, DC  20570
(202) 273-2930

## TABLE OF CONTENTS

**Page(s)**

STATEMENT OF *AMICUS*.................................................................1

ARGUMENT.........................................................................4

I.   The Board's experience shows that inquiry into immigration status chills reporting of violations, frustrating federal labor and immigration policies.............................................5

II.  Board policy precludes unjustified probing into immigration status in conformance with federal labor and immigration policies................................................................14

III. The District Court's decision permitting immigration-related discovery fails to afford appropriate weight to the competing interests..........................................................18

CONCLUSION.......................................................................23

CERTIFICATE OF SERVICE.......................................................26

CERTIFICATE OF COMPLIANCE................................................27

i

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*A.P.R.A. Fuel Oil Buyers Group,*
  320 NLRB 408 (1995) ........................................................................ 7, 12

*AM Prop. Holding Corp.,*
  350 NLRB 998 (2007) ........................................................................ 9, 18

*Beth Israel Hospital v. NLRB,*
  437 U.S. 483 (1978) ................................................................................ 2

*Browning-Ferris Indus. of California, Inc.,*
  362 NLRB No. 186 (Aug. 27, 2015) ...................................................... 10

*Commercial Body & Tank Corp.,*
  229 NLRB 876 (1977) .......................................................................... 10

*Crosby v. La. Health Serv. & Indem. Co.,*
  647 F.3d 258 (5th Cir. 2011) ............................................................... 21

*Farm Fresh Co.,*
  361 NLRB No. 83 (Oct. 30, 2014) ...................................... 12, 16, 17, 20

*Flaum Appetizing Corp.,*
  357 NLRB No. 162 (Dec. 30, 2011) .............................................. passim

*Ford Motor Co.,*
  19 NLRB 732 (1940) .......................................................................... 6, 8

*Hoffman Plastic Compounds v. NLRB,*
  535 U.S. 137 (2002) .................................................................. 7, 14, 15

*Double D. Const. Group,*
  339 NLRB 303 (2003) .......................................................................... 23

*In re Sealed Case (Medical Records)*,
   381 F.3d 1205 (D.C. Cir. 2004) ................................................................ 1

*In re Volkswagen of America, Inc.*,
   545 F.3d 304 (5th Cir. 2008) ........................................................... 19, 21

*John Dory Boat Works*,
   229 NLRB 844 (1977) ............................................................... passim

*Kern v. TXO Prod. Corp.*,
   738 F.2d 968 (8th Cir. 1984) .................................................................. 19

*Labriola Baking Co.*,
   361 NLRB No. 41  (Sept. 8, 2014) .......................................................... 9

*Logan & Paxton*,
   55 NLRB 310 (1944) ................................................................................ 6

*Mezonos Maven Bakery, Inc.*,
   357 NLRB No. 47 (Aug. 9, 2011) ........................................... 7, 9, 12, 13

*Murphy v. Deloitte & Touche Grp. Ins. Plan*,
   619 F.3d 1151 (10th Cir. 2010) .............................................................. 22

*Nat'l Tel. Directory Corp.*,
   319 NLRB 420 (1995) ............................................................................ 22

*NLRB v. Deena Artware, Inc.*,
   361 U.S. 398 (1960) ................................................................................ 14

*NLRB v. Domsey Trading Corp.*,
   636 F.3d 33 (2d Cir. 2011) .................................................................... 15

*NLRB v. Gissel Packing Co.,*
   395 U.S. 575 (1969)..................................................................3

*NLRB v. Ins. Agents' Int'l Union,*
   361 U.S. 477 (1960)..................................................................2

*NLRB v. Mississippi Power & Light Co.,*
   769 F.2d 276 (5th Cir. 1985).....................................................2

*Nortech Waste,*
   336 NLRB 554 (2001) ...............................................................8

*Palma v. NLRB,*
   723 F.3d 408 (2d Cir. 2013) ......................................................8

*Pioneer Natural Gas Co. v. NLRB,*
   662 F.2d 408 (5th Cir. 1981).....................................................3

*Southwester Co.,*
   102 NLRB 1492 (1953) .............................................................6

*Stuart Bochner,*
   322 NLRB 1096 (1997) .............................................................9

*Sure-Tan, Inc. v. NLRB,*
   467 U.S. 883 (1984)........................................................6, 8, 14

*Tuv Taam Corp.,*
   340 NLRB 756 (2003) .............................................................14

*Vaca v. Sipes,*
   386 U.S. 171 (1967) ..................................................................2

*Viracon, Inc.,*
 256 NLRB 245 (1981) ........................................................ 7, 9

*Westside Hosp.,*
 218 NLRB 96 (1975) ........................................................ 6, 11

**Statutes:**

8 U.S.C. § 1324b(a),(6) ........................................................ 17

8 U.S.C. § 1367 ........................................................ 1

8 U.S.C. § 1324a ........................................................ 17

29 U.S.C. § 151 ........................................................ 2

29 U.S.C. § 157 ........................................................ 3

**Federal Rules:**

Federal Rule Civil Procedure 9(b) ........................................................ 17

Federal Rule Civil Procedure 26 ........................................................ 1, 19, 23

**Regulations:**

8 CFR § 274a.2(b),(1),(viii),(A),(5) ........................................................ 18

**Other Authorities:**

Operations Management Memorandum 11-62 (June 2011) .................. 4

# STATEMENT OF *AMICUS*

In the present litigation, this Court will decide whether, and under what circumstances, the EEOC and/or aggrieved employees alleging Title VII violations against an employer must disclose information and documents concerning the employees' U-visa applications or other immigration benefits in response to discovery propounded by their employer. On appeal the EEOC has presented reasons for rejecting disclosure of this information under both Section 1367 of the Immigration and Nationality Act (INA), 8 U.S.C. § 1367, and Rule 26 of the Federal Rules of Civil Procedure. This *amicus* brief focuses on a crucial aspect of the Rule 26 inquiry: whether an employer/defendant's need for this information to test witness credibility on balance outweighs both the *in terrorem* effect such disclosure has on employees and the negative impact on agency enforcement of statutory rights.[1]

---

[1] The Board need not replicate the EEOC's thorough and well-reasoned analysis regarding the statutory issues raised by the confidentiality provisions of Section 1367. The Board agrees with the EEOC's analysis that (1) Section 1367 creates a privilege prohibiting the challenged discovery (EEOC Br. 34-39), and (2) even if no statutory privilege applies, the policies underlying Section 1367 provide additional weight to the non-disclosure side of the balancing scale under Rule 26 (EEOC Br. at 48-50). *See In re Sealed Case (Medical Records)*, 381 F.3d 1205, 1215-16 (D.C. Cir. 2004) ("[I]n determining which interests to weigh in the Rule 26 balance, courts look to statutory confidentiality provisions, even if they do not create enforceable privileges.") (collecting cases).

The National Labor Relations Board (NLRB or Board) has a long standing interest in the question of whether immigration information about employees must be disclosed when raised during litigation of statutory employment rights. The NLRB, an independent federal agency created by Congress to enforce and administer the National Labor Relations Act (NLRA or the Act), 29 U.S.C. § 151 *et seq.*, regulates labor relations between most private-sector employers in the United States, their employees, and the authorized representatives of their employees. It is to the NLRB that Congress "conferred the authority to develop and apply fundamental national labor policy." *NLRB v. Mississippi Power & Light Co.*, 769 F.2d 276, 281 (5th Cir. 1985) (quoting *Beth Israel Hospital v. NLRB*, 437 U.S. 483, 501 (1978)). It is the "the primary function and responsibility of the Board to resolve the conflicting interests that Congress has recognized in its labor legislation." *NLRB v. Ins. Agents' Int'l Union*, 361 U.S. 477, 499 (1960). In fulfilling this statutory role, it is "[t]he public interest in effectuating the polices of the federal labor laws, . . . [that] is always the Board's principal concern in fashioning unfair labor practice remedies." *Vaca v. Sipes*, 386 U.S. 171, 182-83 n.8 (1967). Accordingly, the Board

2

frequently considers the effect of employers' actions and speech on the ability of employees to exercise their statutory rights, including the Section 7 right "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection," or "to refrain from any or all such activities." 29 U.S.C. § 157. As this Court has recognized, the Board has developed special "competence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship." *Pioneer Natural Gas Co. v. NLRB*, 662 F.2d 408, 414-15 (5th Cir. 1981) (citing *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 620 (1969)).

Of particular relevance here, the Board on numerous occasions has considered the effect on employees and the enforcement of workplace rights of probing into personal immigration information. As we show below, the Board's experience has led it to conclude that, given the known *in terrorem* effect on employees of such disclosure, even where immigration information otherwise would be admissible as relevant, the circumstances permitting such disclosure must be strictly circumscribed

3

to prevent unduly encumbering access to and enforcement of employee statutory rights. In this *amicus* brief, filed pursuant to Fed. R. App. P. 29(a), the Board respectfully offers the Court its historical experience and perspective on these critical issues. The Board also respectfully requests that, in weighing the issues presented in this appeal, the Court consider the impact of its decision on agencies and employees within the wider field of labor relations.[2]

## ARGUMENT

The Board's experience has shown that probing into the immigration status of employee witnesses exerts an *in terrorem* effect that chills reporting of labor law violations and cooperation in Board proceedings. As described more fully below, the resulting under-enforcement of federal labor law among undocumented workforces incentivizes employers to hire undocumented workers, unfairly penalizes law-

---

[2] In particular, because NLRB decisions and orders are subject to review in this Circuit, the NLRB wishes to avoid a conflict between the safeguards that the NLRB provides in its administrative hearings and the standards that this Court adopts for the examination of undocumented workers who have applied for U-visas. In addition, the NLRB has occasion to certify individuals seeking administrative relief with respect to immigration status through U-visas. *See* Division of Operations Management Memorandum 11-62 (June 7, 2011)), available at http://apps.nlrb.gov/link/document.aspx/09031d45818801f9 (last visited Oct. 22, 2015).

abiding businesses, and exerts downward pressure on the working conditions of citizens and other authorized workers.

To minimize the *in terrorem* effect and its downstream consequences, while permitting employers to assert legitimate affirmative defenses, the Board has adopted a procedural rule that permits employers to inquire into employees' immigration status to establish an affirmative defense only where the employer has pled that defense with particularity. If that basic threshold is met, the Board carefully balances competing interests to ensure that probing into immigration status is as limited as possible. Here, by contrast, even though similar balancing is required under the Federal Rules of Civil Procedure, the District Court failed to properly weigh the competing concerns surrounding the immigration benefit-related discovery it ordered the plaintiffs to disclose. Accordingly, the NLRB urges the Court to reverse the District Court's order compelling discovery from plaintiffs.

I.   **The Board's experience shows that inquiry into immigration status chills reporting of violations, frustrating federal labor and immigration policies.**

Almost from its inception, the Board has been faced with the question of how to deal with the rights of immigrant employees. *See,*

*e.g.*, *Ford Motor Co.*, 19 NLRB 732, 742 (1940) (employer threatened

deportation and subsequently reported employee to immigration office

in order to "raise obstacle to [employee's] continued union activities");

*Logan & Paxton*, 55 NLRB 310, 315 n.12 (1944) ("The Act does not

differentiate between citizens and non-citizens. In order to effectively

carry out the purposes of the Act, we conclude that no distinction should

be drawn on such a basis."); *Southwester Co.*, 102 NLRB 1492, 1493

(1953) (rejecting employer effort to deny statutory rights to immigrants

and observing that "the eligibility of aliens to vote in Board elections is

well established").[3]

Going back decades, the Board has found that raising immigration

issues in the context of enforcing statutory employment rights

discourages employees from exercising their labor rights, reporting

violations, and participating in enforcement proceedings. *See, e.g.*,

*Westside Hosp.*, 218 NLRB 96, 96-97 (1975) (finding that union's threat

of deportation if employee refused to sign authorization card interfered

with free choice and warranted setting aside election); *John Dory Boat*

---

[3] The Supreme Court confirmed that undocumented workers are statutory "employees" entitled to protection under the NLRA in *Sure-Tan, Inc. v. N.L.R.B.*, 467 U.S. 883, 891-92 (1984).

*Works*, 229 NLRB 844, 848, 852 (1977) (subpoenas probing into immigration status interfered with witnesses' ability to testify); *Viracon, Inc.*, 256 NLRB 245, 247 (1981) (finding that employer's threats of deportation if employees elected union representation were unlawful coercion).

On the basis of its long experience in protecting the statutory rights of workers, the NLRB has concluded that "undocumented aliens are extremely reluctant to complain to the employer or to any of the agencies charged with enforcing workplace standards for fear that they will lose their jobs or risk detection and ultimately deportation." *A.P.R.A. Fuel Oil Buyers Group*, 320 NLRB 408, 414 (1995).[4] More recently, two Board members observed that undocumented workers "face a double risk in taking concerted action – not just as employees asserting their Section 7 rights . . . but as undocumented immigrants at risk of deportation." *Mezonos Maven Bakery, Inc.*, 357 NLRB No. 47, at *6 (Aug. 9, 2011) (Chairman Liebman and Member Pearce, concurring),

---

[4] The Board recognizes that one of the holdings in *A.P.R.A. Fuel Oil Buyers* has been abrogated by *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137 (2002). That abrogation does not affect the Board's analysis of barriers to labor law enforcement in undocumented workforces.

*aff'd in part and remanded in part on other grounds sub nom. Palma v. NLRB*, 723 F.3d 176 (2d Cir. 2013).

The reluctance of undocumented workers to cooperate with agencies enforcing workplace standards is a natural consequence of the retaliation that has been visited upon those who assert their rights under the NLRA. For example, in response to union activity, employers have demanded that employees produce documents verifying their work authorization status. *See, e.g., Nortech Waste*, 336 NLRB 554, 554-55 (2001) (employer review of its employees' immigration status, purportedly to ensure compliance with federal immigration laws, was "a smokescreen to retaliate for and to undermine a [u]nion's election victory"). Other employers have directly reported employees to immigration authorities. *See, e.g., Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 887 (1984) (employer reported employees the day after a union was certified as their collective bargaining representative); *Ford Motor Co.,* 19 NLRB at 742 (employer reported employee a few days after he began union activities).[5]

---

[5] Although, in many cases, these actions could lead to the employer incurring penalties under the Immigration Reform and Control Act of 1986 (IRCA), those penalties may be offset by the financial savings of employing undocumented

Furthermore, as the Board has found, the mere threat to carry out immigration actions is enough to intimidate employees. "Like the fears of job loss . . . fears of possible trouble with the Immigration Service or even of deportation must remain indelibly etched in the minds of any who would be affected by such actions on Respondent's part." *Viracon, Inc.*, 256 NLRB at 247. Threats touching on immigration status are particularly coercive because they place in jeopardy not only the employees' jobs and working conditions, but also their ability to remain in their homes in the United States. *Id.* at 247, 252-53; *see also Labriola Baking Co.*, 361 NLRB No. 41, at *2 (Sept. 8, 2014) (noting that "threats touching on employees' immigration status warrant careful scrutiny" because "they are among the most likely to instill fear among employees.").

No less intimidating have been efforts by employers and their representatives to exploit judicial or administrative processes in cases where workers (who may or may not be undocumented) have dared to assert violations of their rights. *See, e.g., AM Prop. Holding Corp.*, 350 NLRB 998, 1042 (2007) (attorney stated within earshot of witness that

---

workers – a fact of which those workers are aware. *Mezonos Maven Bakery*, 357 NLRB No. 47, at *6 (Chairman Liebman and Member Pearce, concurring).

he would "have to get an investigator and . . . find out whether she's here in this country illegally"), *overruled on other grounds by Browning-Ferris Indus. of California, Inc.*, 362 NLRB No. 186 (Aug. 27, 2015); *Stuart Bochner*, 322 NLRB 1096, 1105 (1997) (attorney told witness that he would wait to see if the Board reported him to the INS, and if the Board did not, he would do so himself); *Commercial Body & Tank Corp.*, 229 NRLB 876, 879 (1977) (respondent's official told witness outside hearing room that he was surprised that he was in a government building, and asked him what would happen if the immigration service came in).

The Board's experience also cautions against allowing employers to serve subpoenas on Board witnesses commanding them to produce documents regarding immigration status. In *John Dory Boat Works*, an employer that had already threatened an employee with deportation if he testified in Board proceedings served that employee and other Spanish-speaking employees with *subpoenas duces tecum* requiring production of immigration documents. 229 NLRB at 848, 852. The employer's counsel argued that the subpoenaed documents were necessary to "test the credibility of all those witnesses by calling into

question whether they signed their proper names on their pretrial affidavits." *Id.* at 852. However, in light of counsel's failure to pursue his hypothesis during the administrative hearing, the administrative law judge determined counsel's explanation to be mere pretext. *See id.* at 848, 852. Even though the subpoenas were quashed, the judge observed that "the effect upon the . . . witnesses of [such] wholly irrelevant prob[ing] into their immigration status . . . ranged from unsettling to devastating and certainly affected their ability to testify." *Id.* at 852.

As the EEOC has similarly observed (EEOC Br. at 60-61), inquiries of this sort chill cooperation not only among those employees whose status is questioned, but also among other employees in similar circumstances who, absent safeguards, understandably expect that coming forward will result in "an embarrassing and frightening inquiry into their immigration status." *Flaum Appetizing Corp.*, 357 NLRB No. 162, at *7 (Dec. 30, 2011); *see also Westside Hosp.*, 218 NLRB at 96 (noting, in the context of a union election, that coercive threats are "the subject of discussion, repetition, and dissemination among" employees). "[E]ven authorized employees may be chilled from exercising their

Section 7 rights if it means they might be questioned about their actual or perceived immigration status." *Farm Fresh Co.,* 361 NLRB No. 83, at *1 n.1 (Oct. 30, 2014). "The foreseeable result is a workplace culture in which . . . exploitation of such workers 'can occur in secret and with relative impunity.'" *Mezonos Maven Bakery*, 357 NLRB No. 47, at *7 (Chairman Liebman and Member Pearce, concurring) (quoting *A.P.R.A. Fuel Oil Buyers*, 320 NLRB at 414).

Coercive pressure brought to bear on undocumented workforces impacts not just the individual undocumented workers, but also the broader community of American citizens, authorized workers, and law-abiding business owners. The Board so concluded in *A.P.R.A. Fuel Oil Buyers*, 320 NLRB at 414:

> As recognized by Congress and the Supreme Court in *Sure-Tan*, the appeal of undocumented workers to employers is that aliens will often accept wages and conditions of employment considered unconscionable in this country. A ready supply of individuals willing to work for substandard wages in unsafe workplaces, with unregulated hours and no rights of redress, enables the unscrupulous employers that depend on illegal aliens to turn away Americans and legally working alien applicants who hesitate to accept the same conditions. In addition, the continuous threat of replacement with powerless and desperate undocumented workers would certainly chill the American and authorized alien workers'

> exercise of their Section 7 rights. We recognize, as have both Congress and the Supreme Court, that this chain of events wreaks havoc with Federal policies concerning both labor and immigration.

*Accord Mezonos Maven Bakery,* 357 NLRB No. 47, at *8 (Chairman Liebman and Member Pearce, concurring) ("[U]ndocumented immigrants' availability in a labor market tends to depress wages and working conditions for others in the same market."). Those employers who obey the law "typically shoulder higher labor costs than do those who employ unauthorized aliens." *Id.* at *9. Under-enforcement of labor laws among undocumented workforces therefore results in a competitive disadvantage for law-abiding employers. *See id.*

In sum, the Board has found that the well-documented history of immigration-related intimidation tactics – used to silence employees and thwart their willingness to report statutory violations – risks the under-reporting of NLRA violations among undocumented workforces. This, in turn, has untoward consequences for the greater economic landscape, undermining not only the policies of the NLRA, but running counter to the goals of federal immigration law as well.

II.    **Board policy precludes unjustified probing into immigration status in conformance with federal labor and immigration policies.**

Because undocumented workers are employees protected by the NLRA, *see Sure-Tan*, 467 U.S. at 891-94, the Board has long held that an employee's immigration status is not relevant to the determination of whether a respondent – employer or union – has violated the Act. *Tuv Taam Corp.*, 340 NLRB 756, 760 (2003) ("[I]mmigration status of the discriminatees (much less the Respondent's mere suspicion about that status) does not bear on whether the Respondent engaged in the unlawful conduct alleged."). Accordingly, except in narrow circumstances, the Board precludes inquiries into immigration status in the merits phase of Board proceedings. *See id.*[6] However, because undocumented workers are ineligible for certain remedies under the Act, employers may raise immigration status as a defense in the compliance phase. *See Hoffman Plastic Compounds*, 535 U.S. at 151-52.

---

[6] NLRB proceedings following the issuance of a complaint that a party committed an unfair labor practice are bifurcated into a "liability" or "merits" phase – during which the General Counsel seeks to prove that a respondent violated the Act before an administrative law judge and, eventually, the Board – and a "compliance" phase – during which the precise choice of remedies is adjudicated. *See NLRB v. Deena Artware, Inc.,* 361 U.S. 398, 411 (1960) (Frankfurter, J., concurring) (describing procedure).

Observing that employers have launched probes into immigration status during compliance proceedings without a legitimate basis, the Board has been concerned that such probing would jeopardize labor law enforcement absent administrative limits. *See Flaum Appetizing*, 357 NLRB No. 162, at *6-7. The Board has anticipated that, without procedural restrictions, employers charged with unfair labor practices would be encouraged to "serve subpoenas, and elicit testimony [concerning employees' immigration status] whenever a discriminatee has a Hispanic surname." *Id.* at *6. Hence, failing to appropriately limit probing into immigration status "would inevitably lead to unwarranted delay, abuse of the Board's processes, and a waste of administrative resources[,]" while, contrary to the policies underlying the NLRA, "plac[ing] hurdles in front of employees who come to the Board to vindicate their rights and those of the public." *Id.* at *7.

While employers may cross-examine discriminatees about their immigration status in NLRB compliance proceedings, courts have recognized that it is for the Board "to fashion evidentiary rules consistent with *Hoffman*" that "preserve the integrity of its proceedings." *NLRB v. Domsey Trading Corp.*, 636 F.3d 33, 39 (2d Cir.

2011). In the exercise of that responsibility, the Board requires employers to "articulate a basis for pleading an affirmative defense, thereby opening up an avenue through which to subpoena documents and examine witnesses in order to discover evidence to support its defense." *Flaum Appetizing*, 357 NLRB No. 162, at *4. In other words, the Board prevents employers from raising an immigration status-based defense "with the mere hope of discovering evidence to support it." *Id.* Instead, the Board requires the employer to provide a bill of particulars identifying the individuals against whom an affirmative defense applies, and to briefly state the alleged facts establishing the defense. *See id.* at *3, *8.[7]

Meeting the threshold pleading requirement does not serve to license open-ended inquiry into immigration status. Rather, all inquiries are subject to careful weighing of an employer's interests in supporting the defense against the chilling effect an employer's inquiries will have on current and potential Board witnesses. *See, e.g.*, *Farm Fresh*, 361

---

[7] The Respondent in *Flaum Appetizing,* much like Koch Foods here, sought to subpoena a broad array of immigration information from the individual discriminatees, including evidence of all authorizations issued by DHS, all work authorizations and correspondence regarding them, birth certificates, and a variety of identity documents, including passports, alien registration cards, driver's licenses, and social security cards. *See* 357 NLRB No. 162, at *3.

NLRB No. 83, at *5. While conducting such weighing, the Board also will consider whether the defense can be supported through other means. *See id.*

The Board's evidentiary policy finds clear support in generally applicable rules of pleading. *Flaum Appetizing*, 357 NLRB No. 162, at *4-6. Those rules require affirmative defenses to have an articulable basis in fact at the time of filing. *Id.* at *5-6 (collecting cases). This principle applies with even more force in cases like *Flaum Appetizing* and – for that matter – the instant litigation, where an employer's affirmative defense effectively alleges "fraud or analogous conduct." *Id.* at *5. "It is well-established that a party alleging fraud – or claims sounding in fraud – must do so with particularity, regardless of whether the allegation is made in a complaint or an affirmative defense." *Id.* (citing, *inter alia*, Fed. R. Civ. P. 9(b)).

The Board's approach finds further support in the policies underlying the Immigration Reform and Control Act of 1986 (IRCA), 8 U.S.C. § 1324a *et seq. See Flaum Appetizing*, 357 NLRB No. 162, at *6. IRCA does not require reverification of the status of an employee when an

employee files an unfair labor practice charge, or when the Board orders

reinstatement or awards of backpay. *See id.* (citing 8 CFR

§ 274a.2(b),(1),(viii),(A),(5)). In fact, such reverification may amount to

an unfair immigration-related employment practice prohibited by that

statute. *Id.* (citing 8 U.S.C. § 1324b(a),(6)).[8] Hence, failing to adopt the

Board's rule would procedurally "encourage[ ] violation[s] of IRCA." *Id.*

In sum, it is the Board's view that the restrictions it has placed on

immigration-related disclosures are well-supported in law and essential

to fully effectuate important federal policies.

## III.   The District Court's decision permitting immigration-related discovery fails to afford appropriate weight to the competing interests.

A district court tasked with making a discretionary ruling under a

test requiring a balancing of opposing factors abuses its discretion

"when a relevant factor that should have been given significant weight

is not considered; when an irrelevant or improper factor is considered

and given significant weight; and when all proper factors, and no

improper ones, are considered, but the court, in weighing those factors,

---

[8] Along related lines, employers may violate the NLRA when, without evidence of an employee's disabling immigration status, they use the Board's administrative process as a threat implicating immigration status. *See, e.g.*, *AM Prop. Holding Corp.*, 350 NLRB at 1042-43; *John Dory Boat Works*, 229 NLRB at 852.

commits a clear error of judgment." *In re Volkswagen of America, Inc.*, 545 F.3d 304, 310 n.4 (5th Cir. 2008) (quoting *Kern v. TXO Prod. Corp.*, 738 F.2d 968, 970 (8th Cir. 1984)).[9]

The District Court here committed multiple errors in deciding that the *in terrorem* effect of immigration disclosure on employees weighed less than Koch Foods' interests in the contested discovery.[10] First, as the EEOC has thoroughly explained, the District Court mistakenly concluded that the court's protective order and the nature of U-visa applications dispensed with any *in terrorem* concern in this case. *See* EEOC Br. at 19-21, 23-24, 56-63. What the District Court failed to recognize is that, notwithstanding the limits it placed on discoverability, Koch Foods was still thereby obtaining the most essential information at stake for most employees: actual knowledge of the individual's or family members' immigration status. *See id.* at 41. In the Board's experience, that fact alone would be sufficient to invoke the *in terrorem* effect on undocumented and authorized workers alike. *See*

---

[9] The EEOC more fully explicates the governing standard under Rule 26 in its opening brief. *See* EEOC Br. at 27-28, 46-47.

[10] As also argued by the EEOC, a further error in the District Court's analysis was its failure to consider the policies underlying Section 1367 of the INA in its discoverability analysis. *See supra* n.1.

*Flaum Appetizing*, 357 NLRB No. 162, at *7; *Farm Fresh,* 361 NLRB

No. 83, at *1 n.1; *John Dory Boat Works*, 229 NLRB at 848, 852.

Moreover, in this case, the *in terrorem* effect is actually amplified by the

immigration status-related threats that Koch Foods has previously

made – and carried out. *See* EEOC Br. at 9-10, 59. Even employees

unconnected to this lawsuit – in particular other current employees of

Koch Foods – would undoubtedly be afraid to assert their rights under

similar circumstances.[11]

Second, the District Court failed to recognize that Koch Foods'

articulated grounds for probing into employees' U-visa status are

---

[11] The District Court's conclusion that any *in terrorem* effect was mitigated because the individuals "have already revealed to federal immigration and other officials that they are not or were not authorized to be in the United States. . . [so] discovery of the application itself will not bring the claimant's immigration status to the attention of any agencies that do not already know" is simply incorrect. ROA.13052 (EEOC Record Excerpts Tab 5). As the EEOC has noted, the District Court mistakenly conflated separate agencies with immigration-related functions. *See* EEOC Br. at 60. Additionally, the court apparently did not fully appreciate that the U-visa application process – and particularly information related to an applicant's communications with the certifying agency – does not necessarily require individuals to disclose their status to immigration authorities. The application process does not contemplate that the certifying agency will send its certification decision directly to USCIS; instead, the certifying agency provides the signed certification form to the individual, who then includes it as part of a completed application. Nothing mandates that an individual who has received an agency certification actually file a final application with USCIS. Yet, under the court's order, employees are required to disclose any and all communications with the certifying agency as well as copies of U-visa certification forms even if they never forwarded final applications to the USCIS.

deserving of no legal weight here. The EEOC persuasively argued to the District Court, as it has on appeal, that Koch Foods' defense theory – that plaintiffs fabricated claims to obtain legal status – is unsupported and fundamentally implausible. *See* EEOC Br. at 15-16, 43-46, 50-53. The District Court mistakenly believed that the lack of support Koch Foods provided in support of its theory was irrelevant, apparently concluding that discovery should be allowed as long as it is *hypothetically* relevant to such a theory. *See* ROA.13050 n.6 (EEOC Record Excerpts Tab 5) ("[T]he Court makes no judgment as to the validity of the ultimate argument. The question here is whether the information is relevant."). This binary relevant-or-not assessment is logically incompatible with the proper weighing inquiry the District Court should have conducted here. *See In re Volkswagen*, 545 F.3d at 310 n.4. Moreover, notwithstanding the Court's express admonition against doing so, this approach would summarily bless fishing expeditions in contravention of settled law. *See Crosby v. La. Health Serv. & Indem. Co.*, 647 F.3d 258, 264 (5th Cir. 2011) ("Rule 26(b) 'has never been a license to engage in an unwieldy, burdensome, and

speculative fishing expedition.'") (quoting *Murphy v. Deloitte & Touche Grp. Ins. Plan*, 619 F.3d 1151, 1163 (10th Cir. 2010)).

Finally, even if it can be argued that Koch Foods provided sufficient factual support for its fabrication theory, the District Court was obligated to further explore whether alternative means to test credibility that do not place the plaintiffs' immigration status in issue were available to Koch Foods. *See* EEOC Br. at 54-55. The Board adheres to the same principle. Where alternate means of testing credibility are present, prejudice to the employer from the exclusion of potentially relevant evidence is avoided, and potentially chilling inquiries are inappropriate. *See Nat'l Tel. Directory Corp.*, 319 NLRB 420, 420-22 (1995) (denying employer's request for production of union authorization cards that employer contended were necessary for cross-examination and credibility impeachment where disclosure would have produced a chilling effect and employer had other means to rebut testimony and present a vigorous defense). As the Board has observed, credibility can be tested by a variety of methods that "consider [a] witness' testimony in context, including, among other things, his demeanor, the weight of the respective evidence, established or

22

admitted facts, inherent probabilities, and reasonable inferences drawn from the record as a whole." *Double D. Const. Group*, 339 NLRB 303, 305 (2003).

In short, because the District Court failed to properly weigh the *in terrorem* effect of disclosure against Koch Foods' need for the immigration information, its conclusion that immigration-related information could be obtained from individual plaintiffs must be reversed. Moreover, to prevent needless litigation of these issues in future cases – which itself is bound to chill assertion of workplace rights – the Board would urge the Court to adopt the Board's procedural approach requiring an employer to establish facts with particularity before a court balances interests under Rule 26.

## CONCLUSION

As discussed above, the effects of unjustified probing into the immigration status of workers who assert their workplace rights reach far and wide: in the first instance, undocumented and even authorized workers are discouraged from reporting violations and cooperating with enforcement agencies. This can allow grievous exploitation of these fearful employees and violations of the very statutory rights Congress

has long sought to protect. Meanwhile, it has a disruptive effect on the economy by permitting the growth of unregulated workplaces and thereby creating unfair competition for law-abiding business owners. For this reason, the Board's experience led it to conclude that, at the very least, procedural safeguards must be in place to ensure that any discovery into immigration status is not just relevant in a general sense, but actually warranted by the specific facts at issue. Likewise, to guard against the erosion of federal agencies' ability to enforce workplace standards and concomitant detrimental effects on the greater economy, this Court must reverse the District Court's order allowing immigration-related discovery from the plaintiffs in this case.

Respectfully submitted,

s/Nancy E. Kessler Platt
NANCY E. KESSLER PLATT
*Deputy Assistant General Counsel*

BARBARA A. O'NEILL
*Assistant General Counsel*
DIANA ORANTES EMBREE
*Supervisory Attorney*
MISCHA BAUERMEISTER
*Attorney*
AARON SAMSEL
*Law Clerk*

National Labor Relations Board
1015 Half Street SE
Washington, DC 20570
(202) 273-2937

RICHARD F. GRIFFIN, JR.
     *General Counsel*
JENNIFER ABRUZZO
     *Deputy General Counsel*
JOHN H. FERGUSON
     *Associate General Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on October 22, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.

I certify that the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

s/Nancy E. Kessler Platt
NANCY E. KESSLER PLATT
*Deputy Assistant General Counsel*
National Labor Relations Board
1015 Half Street SE
Washington, DC 20570
(202) 273-2937

Dated at Washington, DC
this 22nd day of October, 2015

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed.

R. App. P. 32(a)(7)(B) because this brief contains 4960 words, excluding

the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R.

App. P. 32(a)(5) and 5th CIR. R. 32, as well as the type style

requirements of Fed. R. App. P. 32(a)(6), because this brief has been

prepared in a proportionally spaced typeface, 14-point type (12-point

type in footnotes) using Microsoft Word 2010.


                                    s/Nancy E. Kessler Platt
                                    NANCY E. KESSLER PLATT
                                    *Deputy Assistant General
                                    Counsel*
                                    National Labor Relations Board
                                    1015 Half Street SE
                                    Washington, DC 20570
                                    (202) 273-2937

Dated at Washington, DC
this 22nd day of October, 2015